UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JOHN PATRICK GILBERT,

                             Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                            Defendants.

Case No. 6:12-cv-02029-AC

FINDINGS AND
RECOMMENDATION

_____

ACOSTA, Magistrate Judge:

      Plaintiff, John Patrick Gilbert ("Gilbert") filed this action under section 205(g) of the Social

Security Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the

Commissioner of Social Security (the "Commissioner") denying Gilbert's application for social

security disability insurance benefits ("SSDI") and supplemental security income ("SSI").  The

Commissioner affirmed the decision of the Administrative Law Judge Marilyn S. Mauer ("ALJ")

                           *{ETZ}*

finding Gilbert not disabled.  The court concludes the Commissioner's decision should be reversed in part and remanded for additional administrative proceedings consistent with this opinion.

*Procedure*

On or about October 17, 2008, Gilbert filed an application for SSDI and SSI alleging an onset date of August 28, 2008.  The Social Security Administration initially denied Gilbert's application, and also denied his application upon reconsideration after a hearing in front of the ALJ.  The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

*Background*

I.    Factual Background.

Gilbert was born on January 2, 1969, and was 39 years old when he applied for SSDI and SSI in 2008.  R. 326.  He graduated from George Washington High School in Denver, Colorado, where he received a modified diploma after attending special education classes.  R. 50, 182.  His past relevant work experience includes telephone solicitor, hand packager, and security guard for several different employers, including Public Safety Warehouse, Northwest Direct of Eugene, Affordable Company USA, Gaylord Security, Pinkerton's, Action Security and Investigation, Burns International Security, and Pearl Buck Center.  R. 51-54, 59-60, 62.  The ALJ found Gilbert had not engaged in substantial gainful activity since August 28, 2008, and did not consider his last work attempt as a hand packager in 2009 at Pearl Buck Center to constitute substantial gainful work activity because that job lasted just nine days, and Gilbert earned only $535.50.  R. 18, 62.

Gilbert alleges disability due to mental retardation and attention deficit (hyperactivity) disorder ("ADD/ADHD").  He also alleges his deteriorating memory makes it impossible for him to sustain employment.  (Def.'s Br. at 2).

2 - FINDINGS AND RECOMMENDATIONS                                    *{ETZ}*

II.    <u>Medical Evidence.</u>

Gilbert was examined by several doctors prior to the ALJ's final determination on his disability. Two psychologists, Dr. Charlotte Higgins-Lee, Ph.D. ("Dr. Higgins-Lee"), and Dr. Leia Hughey, Ph.D. ("Dr. Hughey"), performed psychological evaluations and IQ testing on Gilbert. State agency consulting Dr. Dorothy Anderson, Ph.D., ("Dr. Anderson") reviewed all of the evidence of record, including the psychologists' evaluations and Gilbert's employment history record, and determined Gilbert's mental residual functional capacity ("RFC"). Dr. Paul Rethinger, Ph.D., ("Dr. Rethinger") confirmed Dr. Anderson's RFC and other conclusions. Lyndsie Taylor, a disability analyst, also reviewed Gilbert's file and recorded her opinion about Gilbert's physical abilities. Gilbert's several treating physicians are also on record, and include Sarah Sheffield, F.N.P. (Family Nurse Practitioner) ("Nurse Sheffield"), Karen Woodson, F.N.P., ("Nurse Woodson"), Dr. Erica Spencer, M.D., ("Dr. Spencer"), and Judy McAtee, R.N. ("Nurse McAtee"). There were no medical experts at Gilbert's hearing; thus, all of Gilbert's medical evidence is contained in his medical records.

A.    *Dr. Higgins-Lee.*

Dr. Higgins-Lee examined Gilbert on November 20, 2008, for a psychodiagnostic examination and IQ test. R. 249. Dr. Higgins-Lee based her ultimate opinions upon these two evaluations as well as Gilbert's subjective statements made to Dr. Higgins-Lee during the examination.

1.    Gilbert's Subjective Statements to Dr. Higgins-Lee.

Because Dr. Higgins-Lee did not review Gilbert's employment records prior to seeing Gilbert, much of the information in her report is based on subjective statements by Gilbert. R. 249.

When Dr. Higgins-Lee asked Gilbert about use of illicit drugs and alcohol, he made a joke instead of answering responsively, and he did not report any history of alcohol use or abuse. R. 250. Gilbert remembered four or five jobs in his life, working in security, telemarketing, and fast food. R. 250. Gilbert reported he is slow and forgets things often, which has been a life long problem and has impeded his ability to maintain steady employment. R. 250-51. Gilbert reported he lost many of his jobs because he could not remember procedures and would talk to coworkers when he was supposed to be working. R. 253. Dr. Higgins-Lee believed Gilbert appeared more capable than he actually was, and opined this could explain why Gilbert gets hired and then fired for dissatisfactory work given the employer's expectations. R. 253.

Gilbert was not able to keep his first appointment for a reason not explained in the record, but was on time for his second one. R. 250. Gilbert was in a good mood during the evaluation, his grooming was good, he filled out all of his intake forms independently, and he was cooperative and had good social skills during the exam. R. 250. Gilbert reported most days he would go out and actively try to find work, then watch television at home. R. 251. He is able to cook some familiar meals, but his fiancé cooks most of the time. R. 251. He also said he occasionally does chores and can use a telephone. R. 251. Gilbert told Dr. Higgins-Lee he would need a job coach in order to keep a job, and that he is trying to start social security benefits. R. 251. Gilbert stated he handles his own finances, though growing up, he had difficulty learning to read, write, and do arithmetic, and had to wear glasses for his lazy eye. R. 250-51.

        2.        Intelligence Testing.

Dr. Higgins-Lee administered a WAIS-III intelligence test to determine Gilbert's IQ. R. 251. Dr. Higgins-Lee thought Gilbert made a good effort, and considered his scores reliable and valid.

R. 251.  The WAIS-III yields three IQ scores, and each measures a different area of intelligence.  R. 252.  Gilbert scored 66 on verbal IQ, 60 on performance IQ, and 61 on full scale IQ, which is below the average range.  R. 252.

### 3.    Dr. Higgins-Lee's Ultimate Conclusion.

Based on her examination, Dr. Higgins-Lee concluded Gilbert has a low level of working memory and difficulty concentrating.  R. 252.  She concluded he was able to read and write based on his filling out the intake forms, but noted his level of adaption was low because he was unable to do simple mental arithmetic.  R. 252.  Ultimately, she concluded that, considering Gilbert's low intelligence, impaired memory and concentration, and slow processing speed, there may not be many jobs he would be able to do.  R. 253.

### B.    Dr. Hughey.

Dr. Hughey examined Gilbert on April 8, 2011 at Country Counseling, LLC, upon referral from Gilbert's attorney.  R. 390.  Dr. Hughey administered several evaluations, including an Assessment Interview, a Personality Assessment Inventory, a Repeatable Battery for the Assessment of Neuropsychological Status, a Rey Memory Test, and a Drug Screen Instant UA.  R. 390.  Dr. Hughey based her ultimate opinions Gilbert's subjective statements as well as the tests she administered.

### 1.    Gilbert's Subjective Statements to Dr. Hughey.

Gilbert informed Dr. Hughey the reason he was seeing her was in aid of his application for SSDI and SSI benefits.  R. 390.  Gilbert reported he had no history of alcohol or drug abuse, and an Instant Screen UA tested negative for six common drugs.  R. 391.  Gilbert told Dr. Hughey he worked in the past but would not define any of his past work as successful employment.  R. 390.

He told her he was always "slow" and he was fired from jobs because his employers became frustrated and impatient with his inability to maintain a simple routine as well as his poor memory and frequent mistakes made during his employment. R. 390.

Gilbert reported he has a valid Oregon driver's license, but since he does not have a car, he does not drive, but instead takes public transportation. R. 391. He will travel only to familiar places, and gets help from his family when he needs to get somewhere new. R. 391. Gilbert also reported he is able to help out with chores around the house if he is reminded what to do, and is able to perform his own grooming and self-care. R. 391. He lives with his fiancé, Ms. Joy Berry, and her 16-year-old son. R. 390. Though Gilbert used to be certified as a security guard, he currently has no vocational or education skills. R. 60, 391.

2.      Personality Assessment Inventory.

Dr. Hughey evaluated Gilbert using the Personality Assessment Inventory ("PAI"). R. 392. The PAI assesses the validity of the test results. R. 392. Dr. Hughey noted Gilbert responded consistently to the test items, but also reported his response patterns indicate defensiveness about personal shortcomings and exaggeration of certain problems. R. 392. Dr. Hughey found Gilbert made an effort to present himself in a favorable light. R. 392. Further, although Gilbert's response patterns reveal obvious contradiction, Dr. Hughey concluded Gilbert was unable to register the inconsistencies of his responses. R. 392.

The PAI suggested Gilbert has significant thinking and concentration problems, is sensitive in social interaction, has poor judgment, and is distractible. R. 392. Dr. Hughey concluded that, given his PAI, Gilbert likely feels he is treated inequitably, his working relationships become strained, and he is unaffected by any effort to support or assist him. R. 392. Finally, Dr. Hughey

noted Gilbert reported significant depressive experiences, including being sad and having thoughts of worthlessness, hopelessness, and personal failure, and Dr. Hughey concluded Gilbert likely feels self-critical and has a negative self-image.  R. 392.

3.    Repeatable Battery for the Assessment of Neuropsychological Status.

Dr. Hughey evaluated Gilbert with a Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS").  R. 392.  The RBANS measures cognitive function and yields a total score that "approximates IQ."  R. 392.  Dr. Hughey noted Gilbert's cognitive ability had not changed significantly since 2008, when Dr. Higgins-Lee evaluated Gilbert's IQ with a formal Wechsler Adult Intelligence Scale Third Edition ("WAIS-III") IQ test.  R. 392.  Gilbert scored a 54 on the intelligence portion of the RBANS exam.  R. 393.  He scored very low in the delayed memory portion, fairly low in the immediate memory portion, in the average range in the language portion, and very low in the visual perception portion of the exam.  R. 393.

4.    Rey Memory Test.

The Rey Memory Test is a simple memory task presented as a more difficult memory task. R. 393.  The test helps screen for malingering and symptom magnification.  R. 393.  When a claimant takes the test and scores less than 9/15, the claimant is likely malingering or exaggerating his/her symptoms of low intelligence or memory impairment.  R. 393.  Gilbert obtained a score of 8/15 on the test.  R. 393.  Though Gilbert scored less than 9, which generally indicates symptom magnification, Dr. Hughey opined Gilbert's visual perception impairment coupled with "memory limitations" explained his lower score.  R. 393.

5.    Dr. Hughey's Ultimate Conclusion.

Based on Gilbert's test results and on her examination, Dr. Hughey concluded Gilbert has

significant, chronic, and longstanding impairments in several areas, including visuospatial perception, delayed memory, and attention. R. 393. She stated Gilbert's functioning is extremely low. R. 393.

Dr. Hughey believed Gilbert guessed answers to test questions and that his guesses were far-afield from the actual answer. R. 393. She stated he made matters worse by confabulating (fabricating imaginary experiences as compensation for loss of memory). R. 393. Dr. Hughey noted Gilbert is fairly well-adjusted to his impairments, and noted he can attend to his own self-care, use public transportation, and has a long-term relationship with a woman he plans to marry. R. 393. Finally, Dr. Hughey reported Gilbert has reasonably sound mental health, but his repeated loss of jobs was easily explained by his cognitive dysfunction. R. 393.

C.    *Dr. Anderson.*

Dr. Anderson is the state agency consultant who reviewed Gilbert's record and provided the ALJ with Gilbert's mental residual functional capacity ("RFC"). Dr. Anderson reviewed Gilbert's medical records, employment records, and questionnaires submitted by Gilbert's previous employers which describe Gilbert's employment tenure and explain the reasons for his terminations. R. 269.

1.    Medical Assessment.

Dr. Anderson evaluated the reports of Gilbert's previous doctors and adopted Dr. Higgins-Lee's IQ evaluation. R. 269. She concluded Gilbert had a slow processing speed, poor memory, and a low level of adaptation, though she noted he could use public transportation. R. 269.

2.    Employment Assessment.

After reviewing Gilbert's employer questionnaires, Dr. Anderson stated several conclusions about Gilbert's work history. R. 269. First, Dr. Anderson found Gilbert could maintain normal

production and quality standards at one job, and was ultimately fired for poor attendance.  R. 269.
Next, she noted Gilbert had been fired for attempting to sell drugs to another employee – an
allegation Gilbert denied.  R. 269.  Further, she reported Gilbert did not need more supervision than
other employees, that he responded to supervisory directions, and that he was able to maintain
normal relationships with coworkers.  R. 269.

        3.      Consistency Assessment.

After reviewing Gilbert's records, Dr. Anderson concluded Gilbert's statements were
partially credible.  R. 269.  She noted Gilbert made several inconsistent statements throughout the
record.  R. 269.  For example, Dr. Anderson noted Gilbert's statements regarding trouble following
simple instructions and filling out forms are inconsistent with his ability to fill out Dr. Higgins-Lee's
intake forms and play cards once per week.  R. 269.  Also, while Gilbert stated he loses jobs because
he is forgetful, the majority of the employer questionnaires cite poor attendance and wrongful or
unbecoming conduct as the reasons for Gilbert's termination.  R. 269.

        4.      RFC.

Based on all of the information she reviewed, Dr. Anderson concluded Gilbert is not able to
understand, remember, or carry out detailed instructions, but he can perform tasks that are broken
up into simple task sequences.  R. 269.  She found Gilbert needs extra time to learn new tasks, a
predictable work setting, and help making work goals, but he does not need special supervision or
a job coach.  R. 269.

    *D.*    *Dr. Rethinger.*

Dr. Rethinger reviewed Dr. Anderson's RFC and Gilbert's file on April 14, 2009, and
affirmed Dr. Anderson's conclusions.  R. 325.  Dr. Rethinger believed Gilbert had mild mental

retardation and opined Dr. Anderson's RFC was accurate because Gilbert had been capable of working in the past.  R. 325.  Dr. Rethinger concluded Gilbert likely has a greater problem with alcohol, and possibly drugs, than previously indicated. R. 325.  He noted that, because Gilbert is not fully consistent on his reports, his functioning is consistent with Dr. Anderson's RFC, which takes Gilbert's inconsistencies into account.  R. 325.

      E.     *Nurse Sheffield.*

Nurse Sheffield treated Gilbert several times in 2009 at Community Health Centers of Lane County.  R. 300.  Nurse Sheffield found Gilbert had a severe problem with alcoholism, which is corroborated by statements from Gilbert's fiancé, Ms. Berry.  R. 300, 297.  Further, Nurse Sheffield reported Gilbert was obese, did not exercise, and generally ate unhealthy foods.  R. 300.

Nurse Sheffield noted during a February 10, 2009, examination that Gilbert tried to cut back on drinking, but ended up binge drinking instead (drinking less times per week but more drinks when he did drink). R. 301.  Later in the year, during a September 21, 2009, appointment, Nurse Sheffield reported Gilbert was still drinking, was an alcoholic, and could be developing liver cirrhosis. R. 340. Nurse Sheffield also reported Gilbert continued to gain weight and eat poor quality food.  R. 340.

      F.     *Other Medical Providers*.

Nurse Woodson examined Gilbert on May 21, 2010, for complaints of a cough that had lasted ten days.  R. 336.  Gilbert's girlfriend, Ms. Berry, also complained that Gilbert had suffered from erectile dysfunction, and wondered if it was caused by Gilbert's excessive drinking.  R. 336.  Nurse Woodson noted Gilbert's drinking problem had been going on for over a year, and stated her concern for Gilbert's liver function.  R. 336.

Dr. Spencer examined Gilbert on December 18, 2008, for complaints of abdominal pain and

a persistent cough, nausea, and vomiting.  R. 273.  During that examination, Dr. Spencer reported Gilbert behaved normally for his age and situation, was able to perform all daily living activities without assistance, and seemed able and willing to learn.  R. 274.

Nurse McAtee examined Gilbert on January 12, 2009, for complaints of congestion and a cough.  R. 287.  Nurse McAtee found Gilbert had normal behavior appropriate for his age and situation, could perform all activities of daily living without assistance, and portrayed an ability and willingness to learn.  R. 288.

Ms. Taylor reviewed Gilbert's file upon reconsideration for SSDI and SSI on April 14, 2009.  R. 324.  Ms. Taylor found Gilbert had no medically determinable physical impairments, and opined Gilbert's statements about his impairments were not consistent with the evidence in the record.  R. 324.

III.    Vocational Evidence.

During Gilbert's hearing in front of the ALJ, Vernon Arne (the "VE"), a vocational expert, testified about Gilbert's ability to work given his limitations.  *See* R. 156.  The ALJ explicitly adopted Dr. Anderson's assessment of Gilbert's RFC.  R. 18.  Accordingly, the ALJ posed a hypothetical to the VE that reflected (for the most part) Dr. Anderson's RFC.  R. 62-64.

The ALJ asked the VE whether a hypothetical "individual of the claimant's age, [and] education, with the past work [previously] described . . . [who can] perform work that requires only simple reasoning that can be learned in 30 days or less" could work.  R. 62-63.  The ALJ also asked whether jobs would be available to "an individual [who] didn't to show up for work, but failed to call in to explain why they [sic] couldn't be at work" to which the VE replied that there would be no jobs available for that type of employee.  R. 62-63.  The VE further clarified that no more than

two unexcused absences per month would be tolerated from an unskilled labor employee.  R. 64.

Further, the VE, in response to Gilbert's attorney's questions, added that anything less frequently

than daily, including weekly, reorientation to the job task by a supervisor would be within tolerable

limits for unskilled labor positions.  R. 64.  Finally, the VE noted that, if there was an expectation

that each employee maintain a certain level of productivity, and the employee was ten to twenty

percent less productive than other employees, then that employee would not be competitively

employed.  R. 64-65.

The VE concluded that Gilbert would be unable to perform his previous work as a security

guard or telephone solicitor.  R. 63.  However, the VE opined Gilbert would be able to perform other

jobs that were abundant in the national and Oregon economy.  R. 63.  First, the VE stated Gilbert

could work as a merchandise marker, of which there are 224,000 positions in the national economy

and 3,200 in Oregon.  R. 63.  Next, the VE found Gilbert would be able to work as an industrial

cleaner, of which there are 384,000 positions in the national economy and 8,200 in Oregon.  R. 63.

Finally, the VE identified the garment bagger job, of which 84,000 positions exist in the national

economy, and 1,100 in Oregon.  R. 63.  The ALJ relied on the VE's testimony to satisfy her burden

of showing Gilbert was able to work, and was not disabled under the Act.  R. 19.

IV.    Gilbert's Hearing Testimony.

Gilbert's hearing was initially scheduled for December 9, 2010, but it was postponed until

Gilbert could obtain legal counsel.  Gilbert's second hearing occurred on May 11, 2011, before ALJ

Marilyn Mauer.  R. 49.  Gilbert's attorney, Brent Wells, VE Vernon Arne, and Gilbert also attended,

along with a reporter.  R. 49.

A.    *Employment.*

Gilbert testified to working at four of his previous jobs: Pearl Buck Center as a hand packager, Public Safety Center as a telephone solicitor, Northwest Direct of Eugene as a phone solicitor, and Affordable Company USA as a sales person. R. 51.

A letter from Pearl Buck Center stated Gilbert worked for nine days in 2009, but was laid off because he was unable to keep up with the required production rate required of each employee. R. 247. Pearl Buck also reported Gilbert had a hard time remembering and learning the simple task he was required to perform. R. 247. Gilbert reported during the hearing he was fired for being too slow at the job task because he could not remember the job task and had to be repeatedly told what to do. R. 52.

The Public Safety Center employee questionnaire indicates Gilbert worked as a telephone solicitor for two months in 2008, and was fired for wrongful conduct – attempting to sell drugs to a coworker. R. 205. Gilbert denied attempting to sell drugs to an employee, and after the unemployment office did an internal investigation, the unemployment office agreed with Gilbert and awarded him unemployment benefits. R. 52. Gilbert believed the reason his managers thought Gilbert was trying to sell drugs was because a co-worker overheard a phone conversation in which Gilbert asked his fiancé to pick up Coca-Cola. R. 52. Gilbert believed his managers lied about Gilbert's poor attendance, and denied ever being absent due to drugs or alcohol. R. 53. Gilbert stated he was absent from work just once and gave prior notice of his absence to visit his dad in the hospital. R. 53. The questionnaire indicated Gilbert and maintained normal attendance, normal production and good quality standards up until his last week of work. R. 206.

Finally, an employee questionnaire from Northwest Direct of Eugene reported Gilbert worked as a telephone solicitor for a little over a year from 2007 to 2008.  R. 215.  The questionnaire reported Gilbert did not need more breaks or supervision than any other employee, responded to supervisory directions, and had good relationships with other employees. R. 215.  Northwest Direct cited poor attendance as the reason for his termination, and stated Gilbert would occasionally fail to show up for work without notifying his managers ahead of time. R. 215.  The questionnaire also indicated Gilbert was able to maintain normal production and quality standards during his employment. R. 216.  Gilbert disagreed with Northwest Direct's statements that Gilbert had poor attendance, and stated he notified his managers every time he had to miss work to see his dad in the hospital.  R. 53.  He stated his managers lied about his attendance problems.  R. 53.

Gilbert also testified about working for Affordable Company, USA, as a sales person.  R. 54. Gilbert worked there for two years in 2005 and 2006 and stated he left because of his dad's health. R. 54.  He also testified he had trouble remembering what to do at that job, and he believes his memory is too compromised to work in a similar job now.  R. 54.

Gilbert stated he has been looking for work, but has not consulted Oregon Vocational Rehabilitation Services, an organization that helps people find jobs. R. 58.  The ALJ told Gilbert in the earlier hearing in December 2010 "you need to go in and talk to [Oregon Vocational Rehabilitations Services]. R. 42.  The ALJ informed Gilbert it does good assessments of people's ability to persist in the workplace. R. 42-43.  Gilbert's fiancé testified she tried to have Gilbert go there, but he refused, and Gilbert told the ALJ the reason he did not go to vocational rehabilitation was because he was busy looking for work.  R. 58.

   *B.      Alcohol Use.*

   Gilbert testified he does not use any drugs.  R. 55.  He stated he used to drink alcohol excessively after one of his friends was shot, but no longer drinks to excess.  R. 55.  In the earlier hearing in December 2010, the ALJ asked Gilbert if he had been to counseling for alcohol, and he answered "I don't drink."  R. 42.  Only after the ALJ told Gilbert she had read his medical records did Gilbert respond "I drink occasionally."  R. 42.

   *C.      Memory Problems.*

   Gilbert testified that his memory is deteriorating and experiences significant fatigue even after a good night's sleep.  R. 56-57.  Gilbert also told the VE he informed Public Safety Center of his memory problems and that he needed extra help in the beginning as he was a slow learner.  R. 57.  He stated Public Safety Center refused to work with him or help him do the job he was hired to do.  R. 57.

*Standard of Review*

   The district court must affirm the Commissioner's decision if it is based on proper legal standards and is supported by substantial evidence of record.  *Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 510-11 (9th Cir. 1987).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  The court must weigh all of the evidence in the record.  *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  However, a court may not substitute its own judgment for the ALJ's, and if the evidence on the record could support either a grant or a denial of SSDI or SSI, then the court must affirm the Commissioner's decision.  *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

The claimant has the initial burden of proving he/she is disabled. *Howard v. Heckler*, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a)(1), 416.920(a)(4)(i). First, the Commissioner must determine whether the claimant is engaged in "substantial gainful activity"; if the claimant has engaged in substantial gainful activity, the claimant is not disabled. *Id.* at § 416.920(a)(4)(i). Otherwise, the Commissioner goes on to step two. *Id.* At step two, the Commissioner must determine whether the claimant has a "medically severe impairment or combination of impairments"; if the claimant does not have medically severe impairments, the claimant is not disabled. *Id.* at § 416.920(a)(4)(ii). If the claimant does have medically severe impairments, the Commissioner goes on to step three, where the Commissioner evaluates whether the impairment meets or equals "one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity"; if the claimant's impairments are listed, the claimant is presumed disabled. *Id.* at § 416.920(a)(4)(iii). Otherwise, the Commissioner proceeds to step four. *Id.*

At step four, the Commissioner must determine whether the claimant can still perform "past relevant work"; if the claimant can perform past relevant work, the claimant is not disabled *Id.* at 416-920(a)(4)(iv). If the claimant is unable to perform past relevant work, the Commissioner goes to step five, and the burden of proof shifts to the Commissioner to establish that the claimant can perform other work. 20 C.F.R. § 416.920(a)(4)(v). If the Commissioner meets this burden and

proves the claimant is able to perform other work which exists in the national economy, he is not disabled. *Id.* If the Commissioner cannot prove the claimant is able to perform other work, the claimant is disabled. *Id.*

*The ALJ's Findings*

At step one of the five-step sequential evaluation process, the ALJ found Gilbert had not engaged in substantial gainful activity since the alleged onset date – August 28, 2008. R. 12. At step two, the ALJ found Gilbert had two severe impairments: alcoholism and mild mental retardation. R. 12. At step three, the ALJ determined Gilbert did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. R. 13. Particularly relevant in this case, the ALJ found Gilbert's IQ was between 60 and 70. R. 14.

The ALJ adopted Dr. Anderson's RFC and found Gilbert is able to perform a full range of work at all exertional levels, but with the following nonexertional limitations: Gilbert is restricted from public contact, restricted from working around hazards due to alcohol abuse, and limited to tasks that require only simple reasoning that can be learned in 30 days or less. R. 14-15. At step four, the ALJ concluded Gilbert was unable to perform any of his past relevant work. R. 18. At step five, the ALJ concluded, given Gilbert's education, age, work experience, and RFC, he could perform other jobs that exist in significant numbers in both the Oregon and the national economy. R. 18. The ALJ relied on the VE's testimony in her conclusion that, given Gilbert's situation and RFC, he was able to work. R. 18. Accordingly, the ALJ found Gilbert was not disabled within the meaning of the Act. R. 19. The ALJ also found Gilbert last met the insured status requirements entitling him to SSDI and SSI on September 30, 2013. R. 12.

*Discussion*

I.    <u>Gilbert's claims of error.</u>

Gilbert argues the ALJ erred by: (1) improperly rejecting the opinions of the examining psychologists and failing to give sufficient reasons for discrediting Gilbert; (2) failing to adequately consider all of Gilbert's limitations in the RFC when considering his ability to work; and (3) failing to find Gilbert's impairments severe and qualifying under listing 12.05 B.  (Pl.'s Opening Br. ("Pl.'s Br.") at 2).  Gilbert asks the court to order the Commissioner to pay benefits.  (Pl.'s Br. at 20).

II.   <u>The ALJ's consideration of the medical evidence and Gilbert's credibility.</u>

Gilbert argues the ALJ erred by improperly discrediting Gilbert's two examining psychologists, Drs. Higgins-Lee and Hughey.  (Pl.'s Br. at 10).  Relatedly, Gilbert argues the ALJ improperly discredited Gilbert's testimony.  (Pl.'s Br. at 10).  The court disagrees with both of Gilbert's claims of error.

   A.    *Standard of review for medical evidence.*

The ALJ is required to consider all relevant medical evidence together with the rest of the relevant evidence in the record.  20 C.F.R. §§ 416.927(b); 416.920b(b), (c).  Generally, the ALJ is required to accord more weight to the opinions of treating physicians than non-treating physicians.  20 C.F.R. § 404.1527(c)(1).  If a treating or examining physician's medical opinion is not contradicted by another physician's medical opinion, the ALJ must state "clear and convincing" reasons, supported by substantial evidence, to reject the treating physician's opinion.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  If a treating or examining physician's medical opinion is contradicted by another physician's opinion, the ALJ must at least provide "specific and

legitimate" reasons, supported by substantial evidence, to reject the treating or examining physician's medical evidence.  *Id.*

Further, the ALJ may reject a physician's opinion if it appears the opinion is based on unreliable information provided by a non-credible claimant.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  To find a claimant not credible, the ALJ must consider several factors, including "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, [] other testimony by the claimant that appears less than candid[,] . . . and . . . the claimant's daily activities."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).  "If the ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing."  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).  The ALJ may discredit a claimant's testimony when it is inconsistent with the evidence of record.  *Tommasetti*, 533 F.3d at 1039.  Additionally, the ALJ may infer that a claimant's lack of candor about his alcohol and drug use also applies to the claimant's descriptions of his pain or impairment.  *Thomas*, 278 F.3d at 959.

   1.  Specific and Legitimate Reasons.

Courts have identified several specific and legitimate reasons the ALJ may rely on when discrediting a treating or examining physician's opinion.  First, a treating or examining physician's medical opinion that is unsupported by the record as a whole constitutes a specific and legitimate reason the ALJ may rely on.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).  Second, a physician's opinion that is based primarily on the subjective report of an incredible claimant is a specific and legitimate reason.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).  Third, a treating physician's opinion that is contradicted by the physician's own treatment notes is

a specific and legitimate reason. *Dominguez v. Colvin*, 927 F. Supp. 2d 846, 859 (C.D. Cal. 2013) (citing *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692-93 (9th Cir. 2009).

   2.  Substantial Evidence.

   The Ninth Circuit has also identified several sources that constitute substantial record evidence. An ALJ may rely on the claimant's own testimony, weaknesses in the examining psychologist's conclusions, and written reports of other medical advisors. *Andrews*, 53 F.3d at 1043. Further, though a non-treating physician's contradicting opinion alone will not satisfy the standard of "substantial evidence," it can be used in part to support the ALJ's conclusion to discredit a treating physician's opinion. *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999).

   B.  *The ALJ's three reasons for discrediting the examining doctors' opinions.*

   Gilbert argues the ALJ improperly discredited the medical opinions of the treating physicians without providing specific reasons for doing so. The court disagrees. The ALJ stated three specific and legitimate reasons for discrediting Drs. Hughey and Higgins-Lee's opinions. R. 16-17. First, the ALJ discredited both Drs. Higgins-Lee and Hughey's opinions that Gilbert could not work because the record as a whole, particularly Gilbert's past work history and letters from past employers, did not support the doctors' conclusions. R. 17. Second, the ALJ discredited both Drs. Higgins-Lee and Hughey's opinions about Gilbert's ability to work because their opinions relied too heavily on Gilbert's subjective statements, and the ALJ determined Gilbert was not credible. R. 17. Third, the ALJ discredited Dr. Hughey's IQ evaluation of Gilbert because her conclusion was inconsistent with her treatment notes and ignored indications of reduced validity during the testing. Further, the ALJ supported each of these reasons with substantial record evidence.

1.    Doctors' conclusion inconsistent with record as whole.

One "specific and legitimate" reason the ALJ states to discredit Drs. Hughey and Higgins-Lee's opinions is both examining psychologists' conclusions were contradicted by the record as a whole. R. 17. As the ALJ notes, both doctors concluded Gilbert was unable to work given his limitations. R. 17. Dr. Hughey concluded "there may not be many jobs [Gilbert] is able to do," and Dr. Higgins-Lee concluded "[Gilbert's] loss of jobs is easily explained by his cognitive dysfunction." R. 253, 393. An ALJ may cite, as a "specific and legitimate reason" to discredit a treating physician's opinion, the fact that the medical opinion contradicts the record as a whole. *Batson*, 359 F.3d at 1195. Thus, the ALJ properly stated the specific reason that the treating physicians' conclusions were contradicted by the record as a whole to discredit their opinions.

The ALJ supported her discrediting the doctors' opinions with substantial record evidence. Weaknesses, such as irregularities or contradictions, in an examining psychologist's conclusion constitute substantial evidence. *Andrews*, 53 F.3d at 1043. Here, the fact that neither doctor had any access to Gilbert's actual employment record or the employer questionnaires, both of which are in the record, are weaknesses in the psychologists' conclusions that Gilbert cannot work. The ALJ also relied in part on Dr. Anderson's medical opinion and review of the record to discredit the treating doctor's opinion about Gilbert's work ability. R. 269. This constitutes substantial evidence in this case because it is not the only thing the ALJ relied on in discrediting the examining psychologists, but rather, it is combined with Gilbert's employment records. *Morgan*, 169 F.3d at 602 (holding that, though the opinion of a nonexamining medical advisor cannot by itself constitute substantial evidence, courts "have consistently upheld the Commissioner's rejection of the opinion of a treating or examining physician, based *in part* on the testimony of a nontreating, nonexamining medical

advisor."). Finally, the claimant's own testimony constitutes substantial evidence if it tends to show the claimant is unreliable, contradictory, or his impairments are not as bad as he claims. *Andrews*, 53 R.3d at 1043. The ALJ told Gilbert he needed to see the Oregon Vocational Rehabilitation Services, which he did not do. R. 42-43, 57-58. Gilbert's own testimony contradicts the psychologists' opinion that he cannot work because he has not attempted to get help in finding a job. Gilbert also testified he left or was terminated from at least three jobs because his dad had health problems, not because he could not perform the work. R. 52-53. Accordingly, the ALJ sufficiently supported her reason that the record as a whole provided substantial evidence that contradicted the treating psychologists' medical conclusions about Gilbert's inability to work.

   2.    Doctors' opinions relied on Gilbert's incredible subjective statements.

The ALJ discredited Drs. Higgins-Lee and Hughey's medical conclusions regarding Gilbert's ability to work because both doctors relied in large part on Gilbert's subjective statements. R. 17. When the ALJ properly finds the claimant incredible, then the ALJ may discredit any treating physician who relies on the claimant's subjective statements as well. *Andrews*, 53 F.3d at 1043. The ALJ did find Gilbert incredible. R. 17, 18. So, the ALJ properly stated this specific and legitimate reason for discrediting the psychologists' opinions so long as the ALJ correctly found Gilbert an incredible complainant.

   a.    Gilbert's Credibility.

The ALJ supported her finding that Gilbert was not credible with several pieces of "substantial record evidence." The ALJ can consider, among other factors, the claimant's reputation for lying and prior inconsistent statements to determine whether to credit the claimant's testimony. *Tommasetti*, 533 F.3d at 1284. Also, a claimant's lack of candor about his/her alcohol and drug use

makes the claimant's descriptions of his pain or impairment less credible.  *Thomas*, 278 F.3d at 959.

Gilbert lied and provided inconsistent statements on the record several times.  Gilbert initially

testified he did not use any alcohol.  R. 42.  Only after the ALJ informed Gilbert that she had read

his medical records, which documented his history of alcoholism, did Gilbert admit to drinking

occasionally.  R. 42.  Gilbert's misrepresentations about his alcohol use are repeated throughout the

record.  When Dr. Higgins-Lee asked about his alcohol use, Gilbert replied with a joke instead of

a serious answer.  R. 250.  Gilbert also told Dr. Hughey he had no history of alcohol abuse.  R. 391.

However, Gilbert's history of alcohol abuse is well documented by Dr. Sheffield.  R. 301-303, 340.

Dr. Woodson also expressed her concern about Gilbert's liver function because of his drinking

problem.  R. 336.  Gilbert's testimony on this topic supports the ALJ's conclusion that he is not

reliable and, thus, that Gilbert's testimony lacked credibility.

Next, Gilbert told both of his examining psychologists the reason he was fired was because

he was slow, could not remember simple tasks, and was unable to work without a job coach.

However, Gilbert's employment history and former employer questionnaires directly contradict

Gilbert's claims.  Specifically, the letters from previous employers who cite absenteeism and drug

activity as the reasons for his termination.  R. 205, 215.  Gilbert also testified he left many of his jobs

because of his dad's health problems.  Finally, Gilbert defied the ALJ's recommendation to utilize

Oregon Vocational Rehabilitation Services for job assistance, even though Gilbert told the ALJ he

was trying to find work.  Thus, the ALJ supported her finding Gilbert incredible with substantial

evidence on the record.

        b.      Doctors' conclusions not credible.

Since the ALJ properly found Gilbert not credible, any part of the examining psychologists' medical opinions that rely in any part on Gilbert's own statements also are not credible. *Andrews*, 53 F.3d at 1043. Gilbert was the only source of any information about his employment history or abilities provided to Drs. Hughey and Higgins-Lee. Both doctors' ultimate conclusions about Gilbert's ability to work relied in large part on Gilbert's subjective statements about his employment history. Thus, the doctors' conclusions are not reliable. However, the ALJ discredited the psychologists' opinions only to the extent they were based on Gilbert's subjective statements about his work abilities. The ALJ relied on, and did not discredit, the other objective medical findings of either examining psychologist (except Dr. Hughey's RBANS exam, explained below). The ALJ properly discredited the psychologists' medical opinions about Gilbert's employment abilities which relied on Gilbert's subjective statements.

        3.      The ALJ discredited Dr. Hughey's RBANS IQ exam.

Finally, the ALJ discredited Dr. Hughey's RBANS IQ evaluation because Dr. Hughey's conclusion was inconsistent with her treatment notes and she ignored Gilbert's Rey Memory Test results, which indicated Gilbert's test results were not reliable. Gilbert's record contains two intelligence exams on the record. Dr. Higgins-Lee first administered the WAIS-III IQ exam in 2008, which yielded IQ scores of 61 in 2008. In 2011, Dr. Hughey administered the RBANS exam which approximates IQ and Gilbert received a score of 54. The ALJ discredited the RBANS exam results because Gilbert gave inconsistent responses during the validity testing, and exaggerated during the psychological evaluation. R. 17. Though Dr. Hughey noted Gilbert's test results indicated he was exaggerating, she concluded Gilbert's examination was an accurate measure of Gilbert's cognitive

function. R. 393. The ALJ may discredit a treating physician's opinion when the physician's conclusion is inconsistent with her treating record notes. *Dominguez*, 927 F. Supp. at 859 (citing *Valentine*, 574 F.3d at 692-93). Thus the ALJ cited a specific and legitimate reason for discrediting the RBANS exam.

The ALJ's decision to discredit Dr. Hughey's RBANS IQ evaluation is supported by substantial record evidence. First, Dr. Hughey administered the Rey Memory Test, which is a measure of validity and tests for malingering or symptom magnification. Gilbert's Rey Memory Test was too low to support the validity of any of all the exam results administered by Dr. Hughey. R. 393. Regardless of Gilbert's low score on the Rey Memory Test, Dr. Hughey stated her opinion that Gilbert was not magnifying his limitations for the evaluation. Further, there is evidence Gilbert was exaggerating his responses in other areas of Dr. Hughey's testing, including the PAI exam. Despite these clear indications of reduced validity, Dr. Hughey ultimately concluded Gilbert did not exaggerate. Finally, Dr. Hughey reported Gilbert's cognitive function had not changed significantly since Dr. Higgins-Lee's IQ test in 2008. Thus, the ALJ did not err in discrediting Dr. Hughey's conclusion. The court disagrees that the ALJ improperly rejected the medical opinions of the only examining physicians. The ALJ discredited the two examining psychologists' ultimate opinions about Gilbert's ability to work based on three specific and legitimate reasons, and the ALJ supported all three reasons with substantial record evidence. Thus, the court finds the ALJ's interpretation of the medical evidence is supported by the record.

III.    The ALJ's incorporation of Gilbert's RFC into her examination of the VE.

Gilbert claims the ALJ failed to include all of the limitations supported by the record into the RFC. (Pl.'s Br. at 2). Specifically, Gilbert argues that the VE's testimony is invalid because the ALJ

failed to incorporate Gilbert's limitation of "need[ing] a predictable work setting" into the hypothetical posed during the ALJ's examination of the VE. R. 269, 18, 13. Next, Gilbert argues the ALJ did not include Gilbert's limitation of needing "extra time to learn new tasks" in her questioning of the VE. (Pl.'s Br. at 12). Finally, Gilbert argues the ALJ did not incorporate Gilbert's limitation of needing "help in making reasonable goals" in her questioning of the VE. (Pl.'s Br. at 12). Gilbert argues that all of the doctors in the record basically agree with these three limitations, and the ALJ's failure to incorporate them constitutes harmful error. (Pl.'s Br. at 12). The court agrees with Gilbert in part.

When a VE's hypothetical is not reflective of all of the claimant's limitations, the "'expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.'" *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) (quoting *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991)). The Social Security Program Policy Statement notes that "unskilled work" may require employees "to respond appropriately to . . . usual work situations; and to deal with changes in a routine work setting." SSR 85-15, *available at* 1985 WL 56857, at *4. The court usually must remand the case to determine whether the claimant can perform work after accounting for all the claimant's limitations if the claimant's unaccounted for limitation may be a significant impairment to his/her ability to work. *DeLorme*, 924 F.2d at 850.

Unless this court "can confidently conclude that no reasonable ALJ . . . could have reached a different disability determination," the ALJ's error is harmful. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006). Harmful error must be reversed and remanded for further development of the record. *DeLorme*, 924 F.2d at 850. The court must look at the record as a whole and determine whether the error would alter the outcome of the case. *Molina v. Astrue*, 674 F.3d

1104, 1115 (9th Cir. 2012).  Further, after determining the SSI applicant cannot perform past work, the ALJ has the burden to prove that the applicant can perform other work.  *Yuckert*, 482 U.S. at 141-42.  The ALJ may rely on a VE's testimony to determine whether the claimant can work, but the ALJ must pose an accurate hypothetical to the VE for the VE's testimony to have evidentiary value. *Matthews*, 10 F.3d at 681 (citing *DeLorme*, 924 at 850).

      *A.*    *Gilbert's limitation of needing a "predictable work setting."*

Gilbert first argues the ALJ failed to incorporate Gilbert's limitation, identified by Dr. Anderson in Gilbert's RFC, that he needs "a predictable work setting," into her hypothetical and questioning of the VE.  The court agrees.  Accordingly, the VE's testimony cannot constitute substantial evidence of Gilbert's ability to work, and the ALJ failed to meet her burden of showing Gilbert is capable of other work under step five of the sequential disability evaluation.

      1.    The ALJ's error.

The ALJ adopted Dr. Anderson's RFC as a valid measure of Gilbert's ability to work.  R. 18, 269.  Dr. Anderson's RFC included the limitation that Gilbert required a "predictable work setting" in addition to other limitations.  R. 269.  Without explanation, the ALJ failed to incorporate this limitation into the hypothetical she posed to the VE.  R. 62-64.  Further, neither the ALJ nor Gilbert's attorney asked the VE during the hearing whether Gilbert could still work if he required a "predictable work setting."  Accordingly, the ALJ erred when she failed to adequately incorporate Gilbert's RFC into her examination of the VE.

      2.    Harmful error.

The court finds the ALJ committed harmful error by failing to ask the VE about one of Gilbert's limitations because the ALJ could have reached a different outcome had she incorporated

it.  Unless this court "can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination," then the ALJ's error is harmful. *Stout*, 454 F.3d at 1056.  Here, the court cannot confidently conclude the ALJ's disability determination would be the same if the ALJ asked the VE to incorporate the "needing a predictable work setting" limitation.  When the ALJ fails to incorporate all of the claimant's limitations into the hypothetical she poses to the VE, the VE's testimony lacks any evidentiary value. *Matthews*, 10 F.3d at 681 (citing *DeLorme*, 924 at 850).  Here, the VE's testimony lacks evidentiary value because it failed to incorporate all of Gilbert's RFC limitations.  Further, it is the Commissioner's burden at this step of the analysis to prove Gilbert is capable of other work.  *Yuckert*, 482 U.S. at 141-42.  Since the ALJ relied solely on the VE's testimony to prove Gilbert was able to work, and the court finds the VE's testimony lacks any evidentiary value, the ALJ has not met her burden of proving Gilbert can work.  The ALJ's conclusion that Gilbert can perform other work is not supported by substantial record evidence.  Thus, the ALJ's error is harmful, and the case must be reversed in part and remanded for further development of the record.

      B.      *Gilbert's limitation of needing "extra time to learn new tasks."*

      Gilbert next argues that the ALJ failed to incorporate Gilbert's limitation of needing "extra time to learn new tasks" into the RFC or VE examination.  However, the ALJ sufficiently incorporated Gilbert's limitation from the RFC of needing "extra time to learn new tasks well" into her questioning of the VE.  R. 253, 279, 393.  Dr. Anderson "noted that Mr. Gilbert may need extra time to learn new tasks well."  R. 18.  The ALJ determined this indicates Gilbert needs more time *initially* to learn new tasks, but not that he would need more time than other employees in the long run.  R. 18.  The ALJ asked the VE if the job tasks he identified could be learned in 30 days or less,

and Gilbert's attorney asked if it was possible to work in the jobs the VE identified if he needed additional supervision, to both of which the VE responded yes. R. 63. Further, the ALJ asked the VE, the ALJ asked "if an individual could work at a steady pace, but not necessarily a fast pace, could the individual perform any of those jobs?" and the VE answered "[y]es, yes . . . he would be able to perform . . . all of the jobs that I listed." R. 63. The ALJ properly concluded from this testimony Gilbert could work despite his limitation of needing extra time to learn new tasks.

   C.    *Gilbert's limitation of needing "help in making work goals."*

The VE incorporated Gilbert's limitation of needing "help in making work goals" into his vocational analysis. Dr. Anderson's RFC, adopted in full by the ALJ, states Gilbert does not need any special supervision or a job coach. R. 269. However, Gilbert's attorney asked the VE at the hearing whether an individual would be able to perform work at a competitive level if the person needed weekly reorientation and supervision in order to complete work tasks, and the VE replied yes. R. 64. The ALJ concluded, based on this testimony, Gilbert could obtain help making reasonable work goals by staying in close contact with his managers and receiving the help he needs in meeting his work goals. Thus, the VE fully incorporated Gilbert's limitation of needing help in making work goals into his vocational analysis.

IV.    Gilbert's impairment under listing 12.05 B.

Gilbert next argues the ALJ erred by failing to find Gilbert's impairments severe and qualifying under the 12.05 B listing in 20 C.F.R. Pt. 404, Subpt. P. App. 1. (Pl.'s Br. at 17). The qualifications under 12.05 B are:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or

supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .

B. A valid verbal, performance, or full scale IQ of 59 or less.

20 C.F.R. Pt. 404, Subpt. P. App. 1.

When medical reports are inconclusive or inconsistent, "questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Waters v. Gardner*, 452 F.2d 855, 858 n.7 (9th Cir. 1971).

The ALJ found Gilbert's IQ was accurately measured in 2008, where his lowest IQ score was 60. An IQ score of 60 will not qualify under listing 12.05 B, because that regulation requires a valid IQ score of 59 or less, and 60 is not less than 59. As discussed above in section (II)(B)(3)(b), the ALJ determined the RBANS exam was a more reliable and more accurate measure of Gilbert's IQ for several reasons, all supported by substantial record evidence. The court will defer to the ALJ's conclusion that the RBANS exam was not a reliable IQ measure, and the WAIS-III was reliable, since there is substantial record evidence in support of that conclusion.

Moreover, the Commissioner argues the RBANS test is not a formal IQ test, but instead merely approximates IQ. The Commissioner argues that standardized IQ tests are essential to the adjudication of all cases of mental retardation, as noted in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(b). The Commissioner concludes the WAIS-III IQ test is the only accurate measure of a SSDI and SSI claimant's IQ. (Df.'s Br. 15). This court rejects the Commissioner's argument that WAIS-III is the only permissible measure of IQ. The regulations are clear that some mental illnesses are not easily captured through formal testing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(b).

There may be situations where an RBANS test is the most compelling form of intelligence test for a particular claimant. Instead, the Commissioner here should be affirmed because the ALJ interpreted the conflicting medical evidence and found that the RBANS exam in Gilbert's case was not a credible form of intelligence testing, and the WAIS-III was credible for this claimant. Thus, the ALJ properly discredited the alternative IQ exam and properly found Gilbert's IQ was measured accurately by the WAIS-III.

V.    Payment of Benefits.

        Gilbert asks the court to order the Commissioner to pay benefits because the ALJ improperly found Gilbert able to work. (Pl.'s Br. at 20). The court has discretion to remand a case either for additional evidence and findings or for an award of benefits. *Smolen v. Chater*, 80 F.3d 1273, 1292 (1996). The court can award benefits when the record is fully developed and so further administrative proceedings would serve no useful purpose. *Id.* When the VE's testimony fails to address all of the claimant's limitations, however, the courts have consistently remanded for further proceedings rather than payment of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000). If more evidence or legal argument would likely illuminate the claimant's functional capacity, the Ninth Circuit has remanded for further proceedings instead of for award of benefits. *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989).

        This case should be remanded for additional proceedings because the record needs to be developed further. The ALJ's error was in failing to incorporate all of Gilbert's limitations identified in Dr. Anderson's RFC into the hypothetical she posed to the VE. This error can only be remedied by reopening the record and asking a VE whether Gilbert can perform work given all of his limitations. Reopening the record here serves a very useful purpose – the ALJ has not currently

satisfied her burden under the Act of proving Gilbert is capable of working. More evidence, namely VE testimony on point, is important to Gilbert's functional capacity because it will determine whether Gilbert is able to perform other work. Because the record has not yet been fully developed, and the disability determination turns on additional development of the record, the court denies Gilbert's request to remand for an award of benefits. Instead, the court should remand for further proceedings consistent with this opinion.

*Recommendation*

Based on the foregoing, the Commissioner's final decision should be AFFIRMED in part and REVERSED in part and REMANDED for further proceedings consistent with this opinion.

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due no later than fourteen days after the date this order is filed. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, any party may file a response within fourteen days after the date the objections are filed. Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

DATED this 16th day of April, 2014.


_____/s/ John Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge